UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DEBORAH KAMROWSKI,

                                  Plaintiff,

          v.                                                    Case No. 05-CV-9234 (KMK)

MORRISON MANAGEMENT SPECIALIST,                                 OPINION AND ORDER

                                  Defendant.

Appearances:

Deborah Kamrowski
Florida, NY
*Pro Se Plaintiff*

Andrew Paul Marks, Esq.
Littler Mendelson, P.C.
New York, NY
*Counsel for Defendant*

KENNETH M. KARAS, District Judge:

        Plaintiff Deborah Kamrowski, proceeding pro se, brings this action against her former

employer, Defendant Morrison Management Specialist ("Morrison or Defendant"), alleging

discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C.

§ 2000e *et seq.* ("Title VII"), and discrimination in violation of the Americans with Disabilities

Act, 42 U.S.C. § 12112 *et seq.* ("ADA").[1]  Defendant moves for summary judgment on all of

---

[1] Plaintiff did not explicitly assert claims under the New York whistleblower statutes in
either her original or Amended Complaint.  However, Plaintiff's Amended Complaint alleges
that she was subject to adverse employment actions for voicing various concerns about food
sanitation and quality.  Accordingly, construing Plaintiff's pro se complaint liberally, Plaintiff
could be asserting claims of retaliation under sections 740 and 741 of the New York
whistleblower statute.  *See* N.Y. Labor Law §§ 740-41 (McKinney 2006).  *See Graham v.
Henderson*, 89 F.3d 75, 79 (2d Cir. 1996) (explaining that a court must read a pro se litigant's

Plaintiff's claims.  For the reasons set forth below, Defendant's motion is granted.

## I. Background

### A. Factual Background

Plaintiff is a white female who suffers from dyslexia and attention deficit disorder.

Defendant is a "provide[r of] food, nutrition[,] and dining services to the health and hospitals

industry."  (Def.'s Local Rule 56.1 Statement of Undisputed Facts ("Def.'s 56.1 Stmt.") ¶ 1.)[2]

Catskills Regional Medical Center ("CRMC"), a hospital and nursing facility in Sullivan, New

York, is one of Defendant's clients.  (Def.'s 56.1 Stmt. ¶ 2.)  Plaintiff was employed by

Defendant as a Clinical Nutrition Manager at CRMC from November 2002 until she was

terminated in November 2003.  (Affirmation/Aff. of Deborah Kamrowski, Pl.'s Statement of

Undisputed Facts ("Pl.'s Stmt.") ¶ 137; Def.'s 56.1 Stmt. ¶ 5.)[3]  Plaintiff's direct supervisor

during her employment was Brad Chandler, Defendant's Director of Food and Nutrition.  (Def.'s

---

supporting papers liberally, interpreting them "to raise the strongest arguments that they suggest" (internal quotation marks omitted)); *see also Russek v. Dag Media Inc*., 851 N.Y.S.2d 399, 400 (App. Div. 2008) (considering a claim under Section 740 "[d]espite plaintiff's failure to reference the Labor Law in her complaint [because] the intent to bring a whistleblower action [was] clear").  Because the Court is granting Defendant's motion, it need not address the viability of Plaintiff's state law whistleblower claims.

[2] Defendant's motion papers included a statement of undisputed facts, required under S.D.N.Y. Local Civil Rule 56.1.  Plaintiff submitted the required response to Defendant's statement — styled as "Plaintiff's Rebuttal to Defendant's Statement of Undisputed Facts" — indicating those facts that she agrees are not in dispute.  When citing to such facts, the Court will cite only to Defendant's 56.1 Statement.

[3] The submission referred to herein as "Plaintiff's Statement" is the 77-page submission styled as "Plaintiff's Statement of Undisputed Facts."  The Court does not construe the facts included in Plaintiff's Statement as undisputed, as Defendant has not submitted — and, indeed, was under no obligation to submit — a response to Plaintiff's Statement.  Nevertheless, in light of Plaintiff's pro se status, the Court has thoroughly reviewed Plaintiff's Statement and construes it as a memorandum in opposition to Defendant's motion.

56.1 Stmt. ¶ 7.) Sherri Reynolds was an employee of CRMC, who served as Mr. Chandler's administrative assistant. (*Id.* ¶ 10.) Matt Shoemaker was Morrison's Assistant Director of Food and Nutrition (*id.* ¶ 8), and Jeanne Hanslmaier was the Production Manager, (*id.* ¶ 9). Kim Kelly and Carol Parkerson were supervisors in Morrison's Food Services Department, and Rob Finelli and Pam Garnett served as Regional Managers. (Aff. of Brad Chandler ("Chandler Aff.") ¶ 6.) Barbara Lutz was a dietitian with many years of experience at CRMC. (Aff. of Barbara Pritchard nee Lutz ("Lutz Aff.") ¶ 1.)[4]

### 1. Alleged Retaliation

Plaintiff alleges that she was retaliated against for reporting "mismanagement" because she reported numerous food and sanitation concerns to management. For example, Plaintiff claims that she was retaliated against for reporting that Defendant was not "using the recipe" for "classic purees" (Pl.'s Stmt. ¶ 227), experiencing a "food shortage" (*id.* ¶¶ 243-45), keeping food "as old as two weeks" in the walk-in fridge (*id.* ¶ 240), and serving old food to patients, (*id.*; Affirmation/Aff. of Gladys Reeves ("Reeves Aff.") ¶¶ 10, 27). Plaintiff also alleges that she reported such incidents as serving "macaroni [and] cheese because it [did not] smell bad regardless of being [two] weeks old" (Pl.'s Stmt. ¶ 322), "[u]sing the steam table to hold the food [for] three hours" (*id.* ¶ 324), and finding a "hair that is normally found on a mop in an egg salad sandwich," a "[l]ive roach on a dome lid," and a "[f]inger nail in the rice," (*id.* ¶ 325). Plaintiff also alleges that on one occasion, a "dented can of peaches was opened and placed" at another employee's work station, and that "the peaches were left for him to use and that he

---

[4] At the time of the relevant events, Ms. Pritchard was known by her maiden name, Barbara Lutz. Ms. Pritchard is referred to in the Parties' submissions as both Barbara Lutz and Barbara Pritchard.

[would] probably be terminated." (*Id.* ¶¶ 7, 97-98.) Plaintiff was concerned that the peaches were "dripping with syrup that had leaked out" and that "[t]here is no antidote for botulism," so she called infection control. (*Id.* ¶ 199; Tr. of Pl.'s Dep. ("Tr.") 219.)[5] However, Plaintiff admits that the peaches were thrown out and that no patient ever became ill, and that she did not know if the peaches actually had botulism. (Tr. 219.)[6]

Plaintiff also alleges that she was retaliated against for "living the anti-discrimination laws" and "following the anti-discrimination laws." (Pl.'s Stmt. ¶ 172.) Plaintiff alleges that "the first evidence of unfair treatment" was when she "witnessed" an African American employee's flu, but the employee was suspended for being absent even though she was ill. (*Id.* ¶ 175; Tr. 197.) Plaintiff does not allege that she told Mr. Chandler or any other supervisor that this suspension was racially motivated, stating in her deposition that she felt that the employee was suspended for "no reason" because she had the flu. (Tr. 197-98.) Similarly, Plaintiff alleges that another African American employee was suspended for being absent when "[m]anagement was aware" that she went to a funeral, without alleging that Plaintiff reported any racial discrimination related to the suspension. (Pl.'s Stmt. ¶ 174; Tr. 197-98.)

Plaintiff further alleges that she told Mr. Chandler that Ms. Hanslmaier did not "like black people" because Plaintiff had been told this by other people. (Tr. 410; Pl.'s Stmt. ¶ 166.) Plaintiff could not specify when she informed Mr. Chandler that Ms. Hanslmaier did not like

---

[5] Defendant submitted portions of the transcript of Plaintiff's deposition as Exhibit C of the Affidavit of Andrew Marks. At the Court's request, Defendant submitted the entire deposition transcript, which is referred to herein as "Tr."

[6] Plaintiff appears to allege that Ms. Hanslmaier was responsible for the peaches incident, because she "had just enough education to be dangerous, but was bias [sic] enough to set [the employee] up with this hate crime." (Pl.'s Stmt. ¶ 199.)

African Americans, stating that it occurred "anywhere from March."  (Tr. 409.)  At that time,

Plaintiff told Mr. Chandler about an incident involving Wendy McDonald, an African American

employee, who became upset when a kitchen worker splashed water in her face.  (*Id.* at 410-11;

Pl.'s Stmt. ¶ 181.)[7]  Plaintiff also alleges that, in March 2003, she told Mr. Chandler that another

supervisor had informed her that the supervisor had been told by another employee that a kitchen

worker, who was an employee of CRMC, called another kitchen worker (who was also a CRMC

employee) a Spanish word that translated to "little nigger."  (Tr. 383-86.)  Plaintiff also lists

several other incidents that she believes involved racial discrimination, such as African

Americans getting poor schedules or Ms. Hanslmaier throwing coffee at an African American

employee, but she does not allege that she reported any of these incidents to Mr. Chandler or to

other supervisors.  (Pl.'s Stmt. ¶¶ 177-78, 191-96.)  Mr. Chandler did not take any disciplinary

action against Plaintiff in March 2003, when she allegedly reported the kitchen worker incident.

(Tr. 391.)

### 2. Conflicts Between Plaintiff and Coworkers and Supervisors

The Parties agree that there was conflict between Plaintiff and some of her co-workers

and supervisors, but they disagree as to who was at fault.  Plaintiff alleges that she was

frequently treated uncivilly both by her managers and her co-workers.  Plaintiff complains that

fellow employees "spoke rudely about [her] all the time."  (Pl.'s Stmt. ¶ 66.)  In particular,

Plaintiff felt that Ms. Hanslmaier treated her poorly.  According to Plaintiff, Ms. Hanslmaier

gossiped about Plaintiff (*id.* ¶¶ 157, 161), told Mr. Chandler that Plaintiff was "[c]rass" (Am.

---

[7] Although somewhat unclear, Plaintiff appears to allege that Ms. Hanslmaier
discriminated against Ms. McDonald because she did not immediately check on Ms. McDonald,
stated that Ms. McDonald could be disciplined for leaving the kitchen, and because Ms.
McDonald's hours were reduced.  (Pl.'s Stmt. ¶¶ 182-85.)

Compl. Ex. 24, at 2), and harassed Plaintiff by throwing papers, an empty container, and other things at her, (Pl.'s Stmt. ¶ 381; Am. Compl. Ex. 24, at 6).  She alleges that other co-workers cursed at her (Pl.'s Stmt. ¶¶ 287, 321), and that one employee left "[h]and cream on [her] chair four times," (*id.* ¶ 380).

Defendant concedes that "[i]t is undeniable that Plaintiff did not get along with her supervisors and many of her co-workers" (Mem. of Law in Supp. of Def.'s Mot. for Summ. J. ("Def.'s Mem.") 1), contending that Plaintiff "criticized everyone around her," frequently accusing her co-workers of assorted forms of misconduct, (*id.* 6).  Defendant has submitted affidavits of Ms. Hanslmaier, Ms. Pritchard, and Stacey Hollenbeck, three individuals employed at CRMC at the same time as Plaintiff, who stated that Plaintiff was "very polarizing" (Lutz Aff. ¶ 4), and that Plaintiff generated conflicts at work and "meddled in other employees' business," (Aff. of Jeanne Hanslmaier ("Hanslmaier Aff.") ¶ 5; Aff. of Stacey Hollenbeck ("Hollenbeck Aff.") ¶ 2).

Plaintiff also complains of uncivil behavior by Mr. Chandler, her supervisor.  The evidence shows that Mr. Chandler did, on occasion, use inappropriate language (Decl. of Denise Swedish ("Swedish Aff.") ¶ 7; *id.* Ex. C), and Plaintiff alleges that he did so in her presence.  For example, Plaintiff claims that Mr. Chandler also, at least on one occasion, "stated [she] was gross" because she had sores on her legs from her psoriasis.  (Am. Compl. Supp. 4.)  Defendant agrees that Mr. Chandler and Plaintiff had a difficult time communicating with one another "from the outset of her employment" (Chandler Aff. ¶ 7), but Defendant faults Plaintiff for "undermin[ing] [Mr.] Chandler by complaining publicly about his job performance and attributing all deficiencies to his management,"  (Lutz Aff. ¶ 5).

### 3. Disciplinary Action

On June 27, 2003, Mr. Chandler issued a warning letter to Plaintiff informing her of management's concerns about her performance.  (Chandler Aff. Ex. G, at 1.)  The letter addressed, among other things, management's perception that Plaintiff "exacerbate[d]" confrontations with subordinates, reported complaints about "unit concerns that are by nature handled within the unit" to managers outside the unit, communicated with employees about grievances with their managers, and conversed with employees about unsubstantiated rumors.  (*Id.* at 1-2.)  In addition, the letter expressed concern that Plaintiff was not completing her work and instructed Plaintiff to create a schedule to allow her to "catch-up on both patient care duties and [a] management . . . [p]rogram."  (*Id.* at 2 (internal quotation marks omitted).)  The warning letter instructed Plaintiff to attend a one-day seminar entitled "[h]ow to handle people with Tact and Skill" by August 2003.  (*Id.*)  Mr. Chandler discussed the warning letter with Plaintiff and advised her that she must show satisfactory improvement or employment action would be taken.  (*Id.* at 3.)

On September 4, 2003, Mr. Chandler e-mailed Denise Swedish, Defendant's Field Human Resources Manager, to discuss his concerns about Plaintiff's lack of improvement and his intention to issue her a final warning.  (Chandler Aff. ¶ 13.)  As part of the September 4, 2003 e-mail, Mr. Chandler sent Ms. Swedish a draft of "a final 30 days letter to be issued to" Plaintiff, asking Ms. Swedish to "advise [him] on content and procedure."  (*Id.* Ex. H.)  On September 8, 2003, Ms. Swedish provided Mr. Chandler with edits to the thirty-day warning letter and suggestions for reviewing the letter with Plaintiff, including going "through the final warning" with her, describing what needs improvement, and explaining that "[i]f expectations are not met in 30 days, termination will result."  (*Id.*)

7

On September, 26, 2003, after several consultations with Ms. Swedish, Mr. Chandler notified Plaintiff by letter that she was being offered "a final 30-day opportunity to become a positive, working member of the management team." (*Id.* Ex. I, at 1.) The letter stated that Plaintiff's performance would be monitored for thirty days, and that if she had not improved by October 27, 2003, further disciplinary action, including termination, could result. (*Id.*)

### 4. Plaintiff's Allegations of Sexual Harassment

In July 2003, soon after Mr. Chandler's initial warning to Plaintiff, Plaintiff reported to Rob Finelli, Defendant's Regional Director of Operations, that Mr. Shoemaker, the Assistant Director of Food and Nutrition Services, had engaged in sexually harassing conduct. (Affirmation/Aff. of Pl. ("Pl.'s Aff.") 1-2; Pl.'s Stmt. ¶ 354.) Plaintiff allegedly learned of Mr. Shoemaker's conduct from Corrina Banks, a hospital employee, and from Ms. Reeves. (Pl.'s Stmt. ¶¶ 338-40; Reeves Aff. ¶ 25.) According to Plaintiff, Ms. Reeves notified her that she had overheard Ms. Hanslmaier and Mr. Shoemaker discussing "cucumber sex" and that she or another employee witnessed Ms. Hanslmaier "swipe[] a piece of paper up between his legs." (Pl.'s Stmt. ¶ 352.) Ms. Banks told Plaintiff that on another occasion, Mr. Shoemaker told Ms. Banks that she "could get on the table and be the dessert." (Pl.'s Resps. and Opp'n for Mot. of Summ. J. ("Pl.'s Ex.") Ex. E, at unnumbered page 72.)[8] Plaintiff never actually witnessed any of Mr. Shoemaker's inappropriate comments or actions (Tr. 149), but she felt that the repeated reports of Mr. Shoemaker's conduct began to "interfer[e] with [her] ability to get [her] work done," (Pl.'s Stmt. ¶ 354).

---

[8] Plaintiff has submitted two sets of exhibits, both of which are labeled Exhibits A-F, and neither of which show the date of submission. While the Court has reviewed both exhibit sets, the Court herein cites only to the lengthier set of exhibits.

After Plaintiff reported Mr. Shoemaker's conduct to Mr. Finelli, she alleges that he "ignore[d]" the harassment, "hid[] . . . [Mr.] Shoemaker's prior inappropriate sexual behavior," and "[wrote her] up for reporting" the harassment.  (*Id.* ¶ 123.)  Plaintiff has presented no evidence to support her claim that she was written up for reporting the harassment, but Ms. Reeves, in a sworn affidavit, stated that Mr. Finelli "coerced [P]laintiff twice to keep quiet about the sexual harassment," though neither Ms. Reeves nor Plaintiff provided specifics about this claim.  (Reeves Aff. ¶ 24.)

On September 22, 2003, after Mr. Chandler and Ms. Swedish decided to issue a final 30-day warning but prior to the issuance of the letter to Plaintiff, Plaintiff contacted Diane Toomey, Defendant's Human Resources Administrator, and complained about unspecified harassment in the workplace.  (Swedish Aff. ¶ 3; *id.* Ex. A.)  On September 23, 2003, Plaintiff contacted Ms. Swedish and complained that Mr. Chandler's June 2003 warning was harassment because it was preventing her from doing her job.  (*Id.* ¶ 4.)  A few days later, on September 25, 2003, Plaintiff submitted a written complaint to Ms. Swedish regarding alleged harassment by Mr. Chandler and Mr. Shoemaker.  (*Id.* ¶ 5; *id.* Ex. B.)  Plaintiff does not claim that Mr. Chandler sexually harassed her; indeed, Plaintiff stated in her deposition that she "didn't say [Chandler] was [a] sexual harass[er]," but "said he was a harasser."  (Tr. 151.)  However, Plaintiff accuses Mr. Chandler of referring to female employees in "derogatory" terms (Am. Compl. Ex. 24, at 5), calling two of her co-workers "fat ass" (Pl.'s Stmt. ¶ 289), and "dumb as a door knob," (*id.* ¶ 302).

### 5. Other Gender-Based Discrimination Claims

Plaintiff also complains that she was discriminated against by Mr. Chandler based on her gender because he withheld information regarding career development programs from her,

ostensibly because he did not want women to advance in the workplace.  (Tr. 115-18, 133-35.)
Plaintiff admits, however, that the only person whom Mr. Chandler allegedly informed of these
programs was Ms. Hanslmaier, a female employee.  (*Id.* at 117-18.)

Plaintiff also alleges that she was not promoted based on her gender.  Though Plaintiff
advised Mr. Chandler in March 2003 of her interest in a promotion to Assistant Director, the
position was not vacant at the time, as the then-current Assistant Director was only out on a
leave of absence.  (*Id.* at 133-34.)  A new individual was not placed in that position because the
Assistant Director returned from his leave of absence.  (*Id.* at 135.)  Subsequently, Plaintiff did
not request a promotion to a specific available position.  (*Id.*)

Plaintiff claims that other female employees were not promoted.  (Pl.'s Stmt. ¶ 89;
Reeves Aff. ¶ 24.)  She contends that she heard from other employees that Mr. Chandler stated
that he "wanted a man for the position."  (Pl.'s Stmt. ¶ 292.)  Plaintiff has produced no direct
evidence to support this claim.

### 6. Plaintiff's Dyslexia and Attention Deficit Disorder

Plaintiff has dyslexia and attention deficit disorder.  Plaintiff claims that she notified Mr.
Chandler of her dyslexia on at least two or three occasions during her employment, including as
far back as November 2002.  (Tr. 87-90.)  However, the record reveals that Plaintiff's physician,
Dr. John Lucas, notified Defendant on October 14, 2003 (after Plaintiff had been issued the final
30-day warning letter) that she "suffer[ed] from a developmental reading disability and requires
additional time for reading and writing assignments."  (Swedish Aff. Ex. E.)  Plaintiff notified
Ms. Swedish and Mr. Chandler on November 3, 2003 that "the only accommodation[] [she]
need[ed] [wa]s to have important information proof read . . . ."  (*Id.* Ex. F; Am. Compl. Ex. 20,
at 9.)  In her deposition, Plaintiff repeated her assertion that the only accommodation she

required because of her learning disabilities was help with typing and proofreading.  (Tr. 96.)
Plaintiff claims her request for an accommodation in the form of assistance from a co-worker
was denied.  (Pl.'s Stmt. ¶ 416.)

### 7. Termination and Investigation into Plaintiff's Complaints

Thirty-days following the issuance of the September 26, 2003 final warning, on October
27, 2003, Plaintiff was suspended pending an investigation to determine whether her
performance had improved.  (Chandler Aff. ¶ 16.)   In Mr. Chandler's view, "[i]t had not"
because Plaintiff "followed the wrong chain-of-command, challenged management decisions
publicly, focused on concerns outside the scope of her position, failed to complete assignments
in a timely manner[,] and was unable to get along with or work harmoniously with co-workers
and members of management."  (*Id.*)  "For these reasons, [her] employment . . . was terminated
effective November 14, 2003."  (*Id.*)

Ms. Swedish notified Plaintiff on December 8, 2003 of the outcome of her investigation
into Plaintiff's September 26, 2003 complaint of harassment.  Ms. Swedish concluded that Mr.
Shoemaker had made inappropriate gestures and comments in the workplace, and, as a result, he
was terminated.  (Swedish Aff. ¶ 7.)  Ms. Swedish determined that Mr. Chandler had not
engaged in any discriminatory or harassing activity, but found that he had failed to appropriately
address employee relation concerns and used inappropriate language in the workplace.  (*Id.*)
Based on Ms. Swedish's findings, Defendant issued Mr. Chandler a written warning, stating that
he should follow up on conflicts between employees and maintain professionalism in the
workplace.  (*Id.*; *id.* Ex. C.)  Ms. Swedish notified Plaintiff that she found no evidence to support
Plaintiff's allegations that she had been harassed or discriminated against by Mr. Chandler, or
that she was retaliated against.  (*Id.* ¶¶ 7-8; *id.* Ex. D.)

11

Subsequently, on December 17, 2003, Plaintiff wrote to Tony Leggio, an employee of Defendant, renewing her grievances regarding her employment and termination. (Am. Compl. Ex. 6.) Plaintiff's letter prompted a further review of Plaintiff's employment and termination by Glenn Davenport, Defendant's President. (*Id.*) Following his review, Mr. Davenport notified Plaintiff on January 12, 2004 that Defendant was fully closing all investigations prompted by Plaintiff's complaints about her employment and termination. (*Id.*)

### B. Procedural Background

Plaintiff filed a complaint with the New York State Division of Human Rights ("SDHR") on January 22, 2004, charging Defendant with retaliation and unlawful discrimination based on her gender and her disability under the ADA, Title VII, and the New York State Human Rights Law. (Affirmation of Andrew P. Marks ("Marks Aff.") Ex. D.) On March 29, 2005, after an investigation, the SDHR concluded that there was no probable cause "to support the allegations of the complaint." (*Id.* Ex. E, at unnumbered page 4.) On September 6, 2005, the Equal Employment Opportunity Commission ("EEOC") adopted the findings of the SDHR with respect to the ADA and Title VII claims and closed Plaintiff's case. (*Id.* Ex. F.)

Plaintiff, proceeding pro se, filed an initial complaint in this case on October 31, 2005, and an Amended Complaint on November 28, 2005. This case was originally assigned to the Honorable Colleen McMahon, and was transferred to this Court on August 6, 2007.

## II. Discussion

### A. Standard of Review

Summary judgment may be granted when it is shown that there is "no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). "When ruling on a

summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003). A party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists. *See Atl. Mut. Ins. Co. v. CSX Lines, L.L.C.*, 432 F.3d 428, 433 (2d Cir. 2005).

"When the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim.  In that event, the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008) (internal citations omitted).  "When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (footnote omitted); *see also McPherson v. N.Y.C. Dep't of Educ.*, 457 F.3d 211, 215 n.4 (2d Cir. 2006) ("[S]peculation alone is insufficient to defeat a motion for summary judgment.").

The Second Circuit has "repeatedly expressed the need for caution about granting summary judgment to an employer in a discrimination case where . . . the merits turn on a dispute as to the employer's intent." *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008). "Where an employer has acted with discriminatory intent, direct evidence of that intent will only rarely be available, so that 'affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination.'" *Id.* (quoting *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994)).  "Even in the

13

discrimination context, however, a plaintiff must provide more than conclusory allegations to resist a motion for summary judgment." *Id.*; *see also Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001) ("It is now beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases . . . . [T]rial courts should not treat discrimination differently from other ultimate questions of fact." (internal citation and quotation marks omitted)).

Finally, the Court is mindful that "[t]he submissions of a pro se party should be held to less stringent standards than formal pleadings drafted by lawyers." *Monterroso v. Sullivan & Cromwell, LLP*, 591 F. Supp. 2d 567, 577 (S.D.N.Y. 2008) (internal quotation marks omitted); *see also Salahuddin v. Coughlin*, 999 F. Supp. 526, 535 (S.D.N.Y. 1998).  Therefore, courts must read a pro se litigant's submissions liberally, interpreting them "to raise the strongest arguments that they suggest." *Graham*, 89 F.3d at 79 (internal quotation marks omitted).  This does not, however, "relieve plaintiff of [her] duty to meet the requirements necessary to defeat a motion for summary judgment." *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 50 (2d Cir. 2003) (internal quotation marks omitted); *see also Monterroso*, 591 F. Supp. 2d at 577 (noting that "proceeding pro se does not otherwise relieve a litigant from the usual requirements of summary judgment" (internal quotation marks omitted)).

B. ADA Claims

Plaintiff claims that she is disabled within the meaning of the ADA in that she is dyslexic and suffers from attention deficit disorder.  She claims that Defendant discriminated against her on this basis and failed to accommodate her needs.  Defendant seeks summary judgment dismissing the ADA claims on the grounds that Plaintiff is not disabled within the meaning of the ADA.  (Def.'s Mem. 19.)

14

For purposes of the ADA, disability with respect to an individual means: "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or © being regarded as having such an impairment."  42 U.S.C. § 12102(2).  Defendant does not dispute that Plaintiff's learning disability constitutes an "impairment" under the ADA.  Indeed, this is the position of the EEOC, to which the Court defers.  *See* 29 C.F.R. § 1630.2(h) (defining mental impairment as including "learning disabilities"); *see generally Giordano v. City of New York*, 274 F.3d 740, 747 (2d Cir. 2001) ("Because the [EEOC] is the agency that bears responsibility for implementing specific provisions of the ADA, we generally defer to the EEOC regulations in construing the ADA's terms.").  Rather, Defendant argues that Plaintiff has not produced evidence suggesting that the nature of her dyslexia and attention deficit disorder "substantially limits one or more . . . major life activities," as required by the ADA.  42 U.S.C. § 12102(2)(A).

"Merely having an impairment does not make one disabled for purposes of the ADA." *Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 195 (2002).[9]  A plaintiff must "also . . . demonstrate that the impairment [substantially] limits a major life activity," *id*., which means that the impairment either leaves the person "'unable to perform a major life activity that the

---

[9] Congress expressly superseded *Toyota Motor Mfg.* by statute in the ADA Amendments Act of 2008, Pub. L. No. 110-325, 122 Stat. 3553 (2008) (stating that "[t]he definition of disability in this Act shall be construed in favor of broad coverage of individuals under this Act, to the maximum extent permitted by the terms of this Act").  However, these changes did not take effect until January 1, 2009, well after this action was commenced.  *Id.*  As Congress did not express its intent for these revisions to apply retroactively, the reasoning of *Toyota Motor Mfg.* remains applicable to this case.  *See Rogers v. City of New York*, 359 F. App'x 201, 203 n.1 (2d Cir. 2009).  Thus, the amendments do not impact the Court's analysis and the Court will apply the ADA law that existed at the time the conduct at issue occurred.  *See Geoghan v. Long Island R.R.,* No. 06-CV-1435, 2009 WL 982451, at *9 (E.D.N.Y. Apr. 9, 2009) ("[T]he ADA Amendments do not apply retroactively and thus are inapplicable to the claims in this case.  The Court will apply the statute as it existed before the amendments.").

average person in the general population can perform,'" or "'significantly restrict[s] . . . the condition, manner or duration under which [she] can perform a particular major life activity,'" *id*. (quoting 29 C.F.R. § 1630.2(j) (internal brackets omitted)).  Major life activities generally are "those activities that are of central importance to daily life," *id.* at 197, such as "caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working," *Bragdon v. Abbott*, 524 U.S. 624, 638-39 (1998) (internal quotation marks omitted); *see also* 45 C.F.R. § 84.3(j)(2)(ii).  The Second Circuit also has held that "reading" constitutes a major life activity.  *See Bartlett v. N.Y. State Bd. of Law Exam'rs*, 226 F.3d 69, 80 (2d Cir. 2000).  To determine whether an individual has shown "a significant restriction" to a major life activity, courts "should focus on the effect of that impairment on plaintiff's life."  *Bartlett v. N.Y. State Bd. of Law Exam'rs*, No. 93-CV-4986, 2001 WL 930792, at *30 (S.D.N.Y. Aug. 15, 2001) ("*Bartlett II*") (internal citations, quotation marks, and brackets omitted).  Courts may take into account "the mitigating measures [a] plaintiff uses that affect her ability to" participate in the major life activity.  *Id*., 2001 WL 930792, at *35.

Here, Plaintiff has failed to raise a genuine issue of material fact regarding whether her dyslexia or attention deficit disorder substantially impaired a major life activity, including both her abilities to read and work.  The evidence is undisputed that Plaintiff's dyslexia and attention deficit disorder require that she receive "additional time for reading and writing assignments" (Swedish Aff. Ex. E), as well as assistance with typing and proofreading, (Tr. 96).  Yet, "[c]ompleting work at a slower pace due to dyslexia does not ordinarily qualify as a disability under the ADA."  *Teachout v. N.Y.C. Dep't of Educ.*, No. 04-CV-945, 2006 WL 452022, at *5 (S.D.N.Y. Feb. 22, 2006) (holding that the evidence in the record did not support a conclusion that plaintiff's dyslexia substantially limited a major life activity, despite evidence that because

16

of his dyslexia, the plaintiff needed more time to complete tasks, became "stressed out" easily, and made spelling mistakes that "necessitate[d] double-checking"); *see also Stubbs v. Regents of Univ. of Cal.*, No. CIV. S-06-1, 2007 WL 1532148, at *9 (E.D. Cal. May 25, 2007) (finding that the plaintiff's dyslexia did not substantially limit his ability to read when he "admitted that he could read the newspaper"); *Montgomery v. Chertoff*, No. 03-CV-5387, 2007 WL 1233551, at *9 (E.D.N.Y. Apr. 25, 2007) (finding that the plaintiff's attention deficit hyperactivity disorder did not substantially limit her ability to write despite her assertions that she had a "hard time communicating and [wa]s slower at writing and learning new things than others"); *Frank v. Plaza Constr. Corp.*, 186 F. Supp. 2d 420, 434-35 (S.D.N.Y. 2002) (holding that the evidence was insufficient to demonstrate a substantial limitation on a major life activity where the plaintiff presented evidence that her dyslexia created difficulties with reading and writing, which made her perform tasks slowly).  Evidence of more significant burdens on a person's ability to read could constitute a substantial limitation on a major life activity.  *See, e.g.*, *Bartlett II*, 2001 WL 930792, at *35 (finding that the plaintiff was substantially limited in her ability to read where she required significant "coping strategies [to] assist her with reading," including "using her fingers or a card to move from line to line, using an index card with a hole cut out when reading more difficult text, re-reading text multiple times, subvocalizing (*i.e.*, sounding out words), and highlighting important words in the text . . . at the cost of speed and cognitive energy" (footnote omitted)).  Here, however, the undisputed evidence shows that Plaintiff was capable of performing "work functions . . . with only modest accommodations or adjustments in schedule," and that "[s]uch minor inhibitions on the speed with which tasks can be performed, while inconvenient, do not amount to a disability."  *Teachout*, 2006 WL 452022, at *5 n.6. Accordingly, there is insufficient evidence to support Plaintiff's claim that her dyslexia or her

attention deficit disorder constitute disabilities within the meaning of the ADA.

Moreover, Plaintiff has not presented *any* evidence suggesting that Defendant regarded her as having a disability within the meaning of the ADA.  "A 'regarded as' claim turns on the employer's perception of the employee and is therefore a question of intent, not whether the employee has a disability."  *Capobianco v. City of New York*, 422 F.3d 47, 57 (2d Cir. 2005) (internal quotation marks omitted).  "It is not enough that the employer perceive the employee as somehow disabled; the employer must regard the employee as disabled within the meaning of the ADA, i.e., having an impairment that substantially limits a major life activity."  *Id.* (internal quotation marks omitted); *see also Levine v. Smithtown Cent. Sch. Dist.*, 565 F. Supp. 2d 407, 426 (E.D.N.Y. 2008) (same).  A defendant may regard a plaintiff as disabled when "either (1) the defendant mistakenly believes that a person has a physical impairment that substantially limits one or more major life activities, or (2) the defendant mistakenly believes that an actual, nonlimiting impairment substantially limits one or more major life activities."  *Teachout*, 2006 WL 452022, at *8 (internal quotation marks omitted).

Here, Plaintiff asserts that she told Mr. Chandler that she had dyslexia and needed help proofreading the menus, but she does not allege that Mr. Chandler viewed her disability as impairing a major life activity *at all*.  (Tr. 87-91.)  To the contrary, Plaintiff admits that the only accommodation she requested was help with proofreading (*id.* at 93, 96), and the record shows that Mr. Chandler informed Ms. Swedish and Ms. Garnett that the only accommodation Plaintiff needed was "proofreading on long written reports" and that Plaintiff did not need extra time for assignments as long as her workload was not "heavy," (Chandler Aff. Ex. J) (internal quotations omitted).  Indeed, Plaintiff admits that she did not receive any criticism from Defendant regarding her proofreading or the menus.  (Tr. 97-98.)  Additionally, the Court notes that

18

Plaintiff did not submit a doctor's note regarding her disabilities or request any accommodations prior to October 14, 2003, after Mr. Chandler issued Plaintiff the initial June 2003 warning and the final 30-day warning.  As a result, Plaintiff has not raised a genuine issue of fact regarding whether Defendant mistakenly believed that she had a substantially limiting impairment or believed that her non-limiting impairments substantially limited a major life activity.  *See Teachout*, 2006 WL 452022, at *9 (finding that defendant did not regard plaintiff as disabled when its letter granting him an accommodation did not suggest that it was "mistaken with respect to the impairment" or to "the extent to which [his] impairment would limit him"); *Spychalsky v. Sullivan*, No. 01-CV-958, 2003 WL 22071602, at *10 (E.D.N.Y. Aug. 29, 2003) (finding that defendant did not regard plaintiff as disabled within the meaning of the ADA because defendant's recognition of plaintiff's spelling problems did not suggest that it believed his learning disability substantially limited a major life activity).

Accordingly, Defendant's Motion for Summary Judgment on Plaintiff's ADA claims is granted.

### C. Title VII Claims

Plaintiff alleges three claims of employment discrimination based on an adverse action by Defendant under Title VII:  (1) failure to train; (2) failure to promote; and (3) discriminatory termination.  Plaintiff also alleges that she was subjected to a hostile working environment and that she was retaliated against for voicing concerns about racial and gender discrimination.

#### 1. Discrimination Based on Adverse Employment Action

Title VII claims are subject to the familiar burden-shifting framework outlined by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See Holcomb*, 521 F.3d at 138 (applying burden-shifting in Title VII context).  Under this framework, Plaintiff must

19

first establish a prima facie case of discrimination.  *See id.*  Plaintiff's burden at this stage is

minimal.  *See McGuinness v. Lincoln Hall*, 263 F.3d 49, 53 (2d Cir. 2001).  If Plaintiff satisfies

her initial burden, the burden of production shifts to the employer to articulate a legitimate, non-

discriminatory reason for the action.  *See Patterson v. Cnty. of Oneida*, 375 F.3d 206, 221 (2d

Cir. 2004).  "If the employer carries this burden, the burden shifts back to the plaintiff to

demonstrate by competent evidence that 'the legitimate reasons offered by the defendant were

not its true reasons, but were a pretext for discrimination.'"  *Id.* (quoting *Tex. Dep't of Cmty.*

*Affairs v. Burdine*, 450 U.S. 248, 253 (1981)).

  To establish a prima facie case of discrimination based on discrete adverse employment

actions, Plaintiff must introduce evidence showing that:  (1) she was a member of a protected

class; (2) she was qualified for her position; (3) she suffered an adverse employment action; and

(4) "the adverse employment action occurred under circumstances giving rise to an inference of

discriminatory intent."  *Holcomb*, 521 F.3d at 138; *see also Bryant v. Verizon Commc'ns, Inc.*,

550 F. Supp. 2d 513, 534 (S.D.N.Y. 2008) (same).

  Here, it is undisputed that Plaintiff, a woman, is a member of a protected class under

Title VII.  In addition, Plaintiff has produced evidence sufficient to show that she was qualified

for her position.  *See Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 92 (2d Cir. 2001)

(holding that a "plaintiff must show only that [s]he possesses the basic skills necessary for

performance of the job," noting that where "the employer has already hired the employee, the

inference of minimal qualification is not difficult to draw" (internal quotation marks and

brackets omitted)).  Accordingly, the Court's inquiry focuses on whether Plaintiff has presented

evidence to support the two remaining elements necessary to establish a prima facie case of

discrimination.

### a. Failure to Train

Plaintiff alleges that Mr. Chandler, her supervisor, withheld information from her regarding career-development programs because of her gender.  (Tr. 115-18.)  "A plaintiff alleging unequal access to training under Title VII must demonstrate that the employer offered training to other employees and that the plaintiff was denied that training under circumstances giving rise to an inference of discrimination."  *Silva v. Peninsula Hotel*, 509 F. Supp. 2d 364, 379 (S.D.N.Y. 2007); *see also Ani v. IMI Sys., Inc.*, No. 98-CV-8430, 2002 WL 1888873, at *6-7 (S.D.N.Y. Aug. 15, 2002) (holding that a plaintiff cannot establish a prima facie case of failure to train absent evidence which creates an inference of discriminatory treatment).

Plaintiff fails to adduce any evidence to support her failure-to-train claim.  In particular, Plaintiff has not produced evidence to support her allegation that another employee received career-advancing training because her bare allegations fail to identify any individuals of the opposite sex who received career-advancing training.  The only employee whom Plaintiff alleges that Defendant offered such training was Ms. Hanslmaier — a woman.  (Tr. 118.)  On this record, there is no basis from which a jury could reasonably conclude that Plaintiff was denied training under circumstances giving rise to an inference of discrimination.  *See Chan v. NYU Downtown Hosp.*, No. 03-CV-3003, 2006 WL 345853, at *5-6 (S.D.N.Y. Feb. 14, 2006) (finding that plaintiff failed to establish a prima facie case of race discrimination when, inter alia, she did not "identify any similarly situated individuals *outside her protected class* who were treated preferentially" (emphasis added)); *see also Ani*, 2002 WL 1888873, at *4 (noting that a plaintiff may show an inference of discrimination using evidence "showing that similarly-situated employees, not within the plaintiff's protected class, were not subject to the complained-of adverse employment action").  Accordingly, Defendant's Motion for Summary Judgment on

Plaintiff's failure to train claim is granted.

b. Failure to Promote

Plaintiff also claims that Defendant unlawfully failed to promote her.  To establish a prima facie case on her Title VII failure to promote claim, Plaintiff must submit evidence to "demonstrate that . . . she applied and was qualified for a job for which the employer was seeking applicants; . . . she was rejected for the position; and . . . the position remained open and the employer continued to seek applicants having the plaintiff's qualifications." *Petrosino v. Bell Atl.*, 385 F.3d 210, 226 (2d Cir. 2004) (internal quotation marks omitted); *see also Siddiqi v. N.Y.C. Health & Hosps. Corp.*, 572 F. Supp. 2d 353, 368 (S.D.N.Y. 2008) (same).  It is well settled in the Second Circuit that a "prima facie case cannot be established merely with evidence that a plaintiff generally requested promotion consideration." *Petrosino*, 385 F.3d at 227.  "A specific application is required to ensure[] that, at the very least, the plaintiff employee alleges a particular adverse employment action, an instance of alleged discrimination, by the employer." *Id.* (internal quotation marks omitted); *see also Wilson v. N.Y.C. Hous. Auth.*, No. 05-CV-6538, 2007 WL 1032262, at *6 (S.D.N.Y. Apr. 2, 2007) (noting that plaintiff's "failure to proffer evidence identifying any specific positions for which he applied . . . means that he has not made out a prima facie case of discrimination").

Here, the only promotion that Plaintiff sought while employed by Defendant was for a position that was not vacant.  (Tr. 133-34.)  When, in March 2003, Plaintiff requested that she be promoted to the position of Assistant Director of Food and Nutrition, that position belonged to an individual who only was on a leave of absence.  (*Id.*)  It is undisputed that Defendant never placed a new individual in that position because "[t]he individual holding the position returned from leave and ultimately there was no job vacancy."  (Def.'s Mem. 16.)  Indeed, as Plaintiff

22

acknowledged in her deposition, she did not receive that promotion "because [the individual] came back" from his leave of absence and not because of her gender.  (Tr. 135.)  Other than this request in March 2003, it is undisputed that Plaintiff never applied for a specific promotion.  (*Id.* at 133-35.)  Accordingly, Plaintiff cannot establish a prima facie case of a failure to promote actionable under Title VII.  *See Finkelshteyn v. Staten Island Univ. Hosp.*, 687 F. Supp. 2d 66, 84 (E.D.N.Y. 2009) (finding that the plaintiff could not show that the denial of his request for reinstatement was retaliation in violation of Title VII when his former position was not vacant and no other similar positions were available); *Blake v. Bronx Lebanon Hosp. Ctr.*, No. 02-CV-3827, 2007 WL 2981465, at *8 (S.D.N.Y. Oct. 10, 2007) (granting summary judgment on failure to promote claim when the position was eliminated, noting that when "no applicants are sought, no failure to promote claim exists").  Defendant's Motion for Summary Judgment on this claim is, therefore, granted.

### c. Discriminatory Termination

Finally, Plaintiff claims that her termination violated Title VII.  It is well-settled in the Second Circuit that termination of employment constitutes an adverse employment action.  *See Sanders v. N.Y.C. Human Res. Admin.*, 361 F.3d 749, 755 (2d Cir. 2004) (determining that an adverse employment action includes "termination of employment"); *see also Steele-Hegg v. Computer Assocs. Int'l, Inc.*, No. 03-CV-5939, 2007 WL 1989434, at *10 (E.D.N.Y. July 9, 2007) ("[T]he case law within the Second Circuit is well-settled that termination of employment constitutes an adverse employment action . . . .").  Therefore, whether Plaintiff has established a prima facie case of discrimination based on her termination turns on whether she has presented sufficient evidence that the circumstances surrounding her termination give rise to an inference of discrimination.

"[T]here is no unbending or rigid rule about what circumstances allow an inference of discrimination when there is an adverse employment decision . . . ." *Vinokur v. Sovereign Bank*, 701 F. Supp. 2d 276, 291 (E.D.N.Y. 2010) (internal quotation marks omitted).   "A plaintiff may support an inference of [] discrimination by demonstrating that similarly situated employees of a different" gender were not subjected to the same adverse treatment, *Debidat v. Marriott International, Inc.*, 580 F. Supp. 2d 300, 305-06 (S.D.N.Y. 2008), by showing that there were "remarks made by decisionmakers that could be viewed as reflecting a discriminatory animus," *Chertkova v. Connecticut General Life Insurance Co.*, 92 F.3d 81, 91 (2d Cir. 1996), or by showing that there were other "circumstances giving rise to an inference of discrimination on the basis of plaintiff's" gender, *Farias v. Instructional Systems*, 259 F.3d 91, 98 (2d Cir. 2001).   But, Plaintiff "must point to facts that suggest" that the adverse action was motivated, at least in part, by discriminatory animus.  *Kalsi v. N.Y.C. Transit Auth.*, 62 F. Supp. 2d 745, 753 (E.D.N.Y. 1998), *aff'd*, 189 F.3d 461 (2d Cir. 1999); *see also Vinokur*, 701 F. Supp. 2d at 291 ("A plaintiff cannot sustain an action based on her conclusory allegations of discrimination." (internal quotation marks and brackets omitted)).

Plaintiff has not presented any admissible evidence that raises an inference of discrimination based on her gender.  She has presented no evidence that similarly situated employees of a different gender were treated differently.  Nor has she shown any other evidence that suggests an inference of gender discrimination.  She contends that her supervisor, Mr. Chandler, displayed a general hostility toward women, alleging that he referred to female employees in "derogatory" terms (Am. Compl. Ex. 24, at 5), such as when he called two of her co-workers "fat ass" and "dumb as a door knob" behind their backs, (Pl.'s Stmt. ¶¶ 289, 302). She claims that Chandler further demonstrated his disdain for women, and for her in particular,

when he allegedly commented that Plaintiff reminded him of his mother, whom he said he did not like.  (Am. Compl. Ex. 24, at 18.)

Plaintiff provides no evidence to support her contention that these alleged comments were made because Plaintiff and her two co-workers were women.  The "fat ass" and "dumb as a door knob" comments, though certainly rude, are gender neutral statements that do not indicate gender animus.  *See Ford v. N.Y.C. Dep't of Health & Mental Hygiene*, 545 F. Supp. 2d 377, 389 (S.D.N.Y. 2008) (finding no inference of gender discrimination where woman was called "fat fish" and "stupid fish," as those comments, while "disrespectful and rude . . . are not objectively indicative of gender animus"); *Wilson v. Family Dollar Stores of N.Y., Inc.*, No. 06-CV-639, 2008 WL 4426957, at *7-8 (E.D.N.Y. Sept. 25, 2008) (finding no inference of discrimination when the supervisor called the plaintiff "a liar" and "engaged in favoritism and displayed angry facial expressions" because although this "behavior may be rude and unprofessional, it merely indicate[d] personal enmity rather than discrimination"); *see also Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 451 (2d Cir. 1999) ("Title VII does not insulate an individual from criticism that is not based on an impermissible reason.").  Moreover, Mr. Chandler's alleged comment regarding his mother, while disrespectful to Plaintiff (not to mention to his mother) and clearly indicative of Mr. Chandler's dislike for her, does not objectively indicate hostility on the basis of gender. *See Romano v. Stora Enso Corp.*, No. 07-CV-4293, 2010 WL 986535, at *10, *17 (E.D.N.Y. Feb. 12, 2010) (granting summary judgment and finding that comments were gender-neutral when the plaintiff alleged, inter alia, that her supervisor told female employees that "she felt like their mother"), *adopted by* 2010 WL 1005760 (E.D.N.Y. Mar. 17, 2010).  This conclusion is strongly supported by the fact that Plaintiff's hiring and firing were recommended by Mr. Chandler within a relatively short time span. *See Grady v. Affiliated Cent., Inc*., 130 F.3d 553,

560 (2d Cir. 1997) (noting, in the ADEA context, that "when the person who made the decision to fire was the same person who made the decision to hire, it is difficult to impute to her an invidious motivation that would be inconsistent with the decision to hire"); *see also Woodard v. Monticello Cent. Sch. Dist.*, No. 06-CV-13361, 2008 WL 5062125, at *14 (S.D.N.Y. Dec. 1, 2008) (finding that the conclusion that the plaintiff's termination was not racial discrimination was "strongly supported by the fact that [her] hiring and firing were recommended by the same individual within a relatively short time span").

Plaintiff's only allegation that suggests an inference of discrimination based on gender is her allegation that Mr. Chandler commented to "numerous people" — but not to her personally — that he "wanted a man for the position." (Pl.'s Stmt. ¶ 292.) Yet this allegation is nowhere supported by admissible evidence. Plaintiff has not presented an affidavit of a single individual who can verify that Mr. Chandler made this statement. Because Plaintiff cannot rely solely on this or any other hearsay allegation to survive summary judgment, Defendant's Motion for Summary Judgment on this claim is granted. *See* Fed. R. Civ. P. 56(e)(1) (requiring that affidavits supporting or opposing a Rule 56 motion "be made on personal knowledge"); *Velez v. SES Operating Corp.*, No. 07-CV-10946, 2009 WL 3817461, at *10 (S.D.N.Y. Nov. 12, 2009) (finding that the plaintiff "fail[ed] to create a triable issue of material fact" because, inter alia, her evidence was hearsay); *see also Hill v. Rayboy-Brauestein*, 467 F. Supp. 2d 336, 356 (S.D.N.Y. 2006) ("Although the burden of meeting the prima facie case is 'de minimis,' [the p]laintiff must adduce some admissible evidence that would support her claims.").

26

2. Hostile Work Environment Claim

Plaintiff claims that she was subject to a hostile work environment.[10]  To establish a prima facie claim based on a hostile work environment under Title VII, Plaintiff must present evidence that she was subjected to harassment based on her gender.  *See Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998).  She must also demonstrate "(1) that the harassment was sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment, and (2) that a specific basis exists for imputing the objectionable conduct to the employer."  *Alfano v. Costello*, 294 F.3d 365, 373 (2d Cir. 2002) (internal quotation marks omitted); *see also Gorzynski v. Jetblue Airways Corp.*, 596 F.3d 93, 102 (2d Cir. 2010) ("Generally, unless an incident of harassment is sufficiently severe, incidents must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive." (internal quotation marks omitted)).  "This test has objective and subjective elements:  the misconduct shown must be 'severe or pervasive enough to create an objectively

_____

[10] The Court will consider Plaintiff's hostile working environment claim despite Defendant's argument that this claim should be dismissed for "failure to exhaust administrative remedies," because "Plaintiff did not allege harassment in her administrative complaint."  (Def.'s Mem. 17.)  "A district court . . . has jurisdiction to hear Title VII claims that . . . [are] 'reasonably related' to that alleged in the EEOC charge."  *Butts v. N.Y. Dep't of Hous. Pres. & Dev.*, 990 F.2d 1397, 1401 (2d Cir. 1993); *see also Francis v. City of New York*, 235 F.3d 763, 766 (2d Cir. 2000) (holding that the "benefit of the *Butts* 'reasonably related' test is not limited to plaintiffs alleging post-charge conduct").  Under the "reasonably related" standard, courts may hear "claims not raised in the [EEOC] charge . . . where the conduct complained of would fall within the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination."  *Butts*, 990 F.2d at 1402 (internal quotation marks omitted).  Here, Plaintiff's hostile work environment claim is reasonably related to her EEOC charge.  Plaintiff's EEOC charge did not explicitly charge Defendant with fostering a hostile work environment in violation of Title VII, but she did include claims that she "encountered and complained" about, inter alia, "sexual harassment."  (Marks Aff. Ex. D, at 1.)  Indeed, the SDHR final investigation report, which was adopted by the EEOC, noted that Plaintiff complained to Defendant's Human Resources department about, inter alia, "harassment" and "sexual harassment," and that one person was "terminated for sexual harassment."  (*Id.* Ex. E, at unnumbered page 2.)

27

hostile or abusive work environment,' and the victim must also subjectively perceive that environment to be abusive." *Alfano*, 294 F.3d at 374 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)).  Here, Plaintiff's hostile work environment claim centers around her allegations of mistreatment by her co-workers, inappropriate statements by Mr. Chandler, and Mr. Shoemaker's inappropriate conduct toward other employees.

### a. Allegations of Harassment by Co-Workers

Plaintiff's complaints of disrespectful or uncivil behavior by her co-workers are not actionable under Title VII.  Plaintiff's allegations that her co-workers "spoke rudely about" her (Pl.'s Stmt. ¶ 66), gossiped about her (*id.* ¶¶ 157, 161), cursed at her (*id.* ¶¶ 287, 321), threw items at her (*id.* ¶ 7), and left "hand cream on [her] chair" (*id.* ¶ 380), do not state a claim for a hostile working environment under Title VII because there is no basis from which to conclude that this conduct was based on her gender.  While her co-workers' alleged conduct may be obnoxious and sophomoric, Title VII is not a "'general civility code' for the American workplace." *Petrosino*, 385 F.3d at 223 (quoting *Oncale*, 523 U.S. at 81).  Thus, "[s]imple teasing, offhand comments, or isolated incidents of offensive conduct (unless extremely serious) will not support a claim of discriminatory harassment," *id.*, particularly where, as here, there is no reason to conclude that the conduct was aimed at Plaintiff because of her gender. Accordingly, these claims are dismissed.

### b. Allegations of Harassment by Mr. Chandler

Plaintiff also cannot withstand summary judgment on her claim that Mr. Chandler's alleged comments contributed to a hostile working environment.  As discussed above, the comments that Mr. Chandler allegedly made to Plaintiff, while rude, did not convey gender-related hostility.  Indeed, at her deposition, Plaintiff was clear that she viewed Mr. Chandler as a

"harasser," not a sexual harasser.  (Tr. 151.)  The former is not governed by Title VII.

Moreover, as already discussed, Plaintiff's allegation that Mr. Chandler told several of her co-

workers that he "wanted a man for the position" (Pl.'s Stmt. ¶ 292) does not provide a basis to

deny summary judgment, as Plaintiff has failed to present admissible evidence to support this

allegation.  *See Hill*, 467 F. Supp. 2d at 356 ("Plaintiff must adduce some admissible evidence

that would support her claims."); *see also Early v. Wyeth Pharm., Inc.*, 603 F. Supp. 2d 556, 579

(S.D.N.Y. 2009) (noting that the plaintiff could not rely on hearsay statements of other

employees to support her hostile work environment claim).  Although it is undisputed that

Chandler did occasionally use inappropriate language in the workplace (Swedish Aff. ¶ 7; *id.* Ex.

C), Plaintiff has produced no evidence to suggest that this language was used "because of

[Plaintiff's] sex," *Oncale*, 523 U.S. at 80, or that his use of inappropriate language was

"sufficiently severe or pervasive to alter the conditions of [Plaintiff's] employment," *Rowe v.*

*Jagdamba, Inc.*, 302 F. App'x 59, 62 (2d Cir. 2008) (internal quotation marks omitted).

Defendant's summary judgment motion on this issue, therefore, is granted.

### c. Allegations of Harassment by Mr. Shoemaker

Plaintiff's final hostile work environment claim is based upon Mr. Shoemaker's allegedly

inappropriate statements and actions toward other women employed at CRMC, which Plaintiff

did not actually witness.  (Tr. 149.)  Though it is not clear whether Defendant disputes the

specific conduct alleged by Plaintiff, Plaintiff does not dispute that Defendant ultimately

terminated Mr. Shoemaker for making inappropriate gestures and comments in the workplace.

(Swedish Aff. ¶ 7.)  Defendant argues that Plaintiff has failed to state a prima facie case of

hostile working environment because a plaintiff may not "recover damages by pointing to

alleged harassment against others."  (Def.'s Mem. 18.)  Contrary to Defendant's view, the

Second Circuit has held that a plaintiff can have standing to sue under Title VII for "injury to her own work environment, which *she* experienced as hostile by reason of the alleged harassment of other women out of her presence." *Leibovitz v. N.Y.C. Transit Auth.*, 252 F.3d 179, 188 (2d Cir. 2001). To establish such a claim, a plaintiff must demonstrate that, in addition to the standard elements, the "harassment adversely affected the terms and conditions of *her own* employment." *Id.* at 189 (emphasis added).

In *Leibovitz*, the Second Circuit reversed the district court and granted judgment as a matter of law to a defendant in a case in which "much of the alleged harassment did not occur in plaintiff's immediate vicinity and much of what she knew about the situation was second- or third-hand." *Id.* (internal quotation marks omitted). Although the Second Circuit recognized that a plaintiff could potentially recover in such a case if her own working environment was affected, it determined that the plaintiff could not recover because she "presented no evidence that her own working environment was hostile[] and failed to allege or prove that harassment of other women adversely affected the terms and conditions of her own employment." *Id.* at 190. Notably, the Second Circuit emphasized that "the women who were allegedly harassed were working in another part of the employer's premises, out of [the plaintiff's] sight . . . were doing another job, and were allegedly subjected to harassment by a supervisor who supervised them but did not supervise [the plaintiff]," and that "the experiences of those women came to [the plaintiff's] notice via hearsay." *Id.* at 189. District courts within the Second Circuit have been similarly reluctant to accept a prima facie case of a hostile work environment based on harassment experienced by a third party. *See, e.g.*, *Byra-Grzegorczyk v. Bristol-Myers Squibb Co.*, 572 F. Supp. 2d 233, 248 (D. Conn. 2008) (noting that "harassing conduct directed at someone other than a plaintiff . . . does not have the same impact as harassment suffered by a

plaintiff herself." (internal quotation marks and brackets omitted)); *Pronin v. Raffi Custom Photo Lab, Inc.*, 383 F. Supp. 2d 628, 635 (S.D.N.Y. 2005) ("[M]erely working in the same area as [the individual who was harassed] and witnessing" a harassing incident does not, without more, affect "the terms and conditions of [a plaintiff's] employment.").

Here, Plaintiff vaguely claims that the hostile work environment created by Mr. Shoemaker's alleged conduct against other women affected her own work environment by "interfering with [her] ability to get [her] work done." (Pl.'s Stmt. ¶ 354.) For example, Plaintiff alleges that a female employee, Ms. Reeves, informed Plaintiff that she had overheard Mr. Shoemaker discussing "cucumber sex" (*id.* ¶¶ 338-40; Reeves Aff. ¶ 25), and that another female co-worker, Ms. Banks, reported to Plaintiff that Mr. Shoemaker had told her to "get on the table and be the dessert," (Pl.'s Ex. E, at unnumbered page 72). However, as in *Leibovitz*, Plaintiff did not personally witness Mr. Shoemaker's allegedly harassing conduct (Tr. 149), instead learning of the conduct second- and third-hand from her co-workers (Pl.'s Stmt. ¶¶ 338-40, 352). Indeed, Plaintiff admitted in her deposition that Mr. Shoemaker's presence did not affect her (Tr. 149), and the only explanation for why his actions interfered with her work was that she was told about his conduct and did not "know what to do," (*id.* at 151). Likewise, Plaintiff has not produced evidence showing that the women who were allegedly harassed worked in the same area as Plaintiff and/or that Mr. Shoemaker, who was undisputedly one of Defendant's supervisors, actually supervised Plaintiff. Although it is undisputed that Mr. Shoemaker engaged in some conduct that was sufficiently inappropriate to justify his termination, Plaintiff has failed to produce statements from either Ms. Reeves or Ms. Banks confirming her allegations that they were harassed by Mr. Shoemaker, relying instead on Plaintiff's own conclusory hearsay. Because Plaintiff has not produced any other evidence to

31

support her subjective belief that Mr. Shoemaker's conduct affected *her* work environment,

Plaintiff's claim must fail.  *See Hill*, 467 F. Supp. 2d at 355 (noting that the plaintiff's subjective

belief that she was subjected to excess scrutiny on account of her race was insufficient to defeat

summary judgment); *Boyd v. Presbyterian Hosp. in the City of N.Y.*, 160 F. Supp. 2d 522, 540

(S.D.N.Y. 2001) (noting that even if "the [p]laintiff may indeed [have] subjectively fe[lt] that the

work environment under [her supervisor] was a hostile one, [p]laintiff's subjective belief [wa]s

not enough").  Finally, Plaintiff's claim that she suffered injury in the form of management's

inaction on her claim of sexual harassment is belied by the fact that Mr. Shoemaker was

terminated for his inappropriate conduct.  *See Pitts v. Onondaga Cnty. Sheriff's Dep't*, No.

04-CV-828, 2009 WL 3165551, at *10 (N.D.N.Y. Sept. 29, 2009) (noting that when "a

plaintiff's supervisor is the alleged harasser, an employer will be liable if the supervisor uses his

actual or apparent authority to further the harassment," but "where a low-level supervisor does

not rely on his supervisory authority to carry out the harassment . . . an employer will generally

not be liable unless the employer either [1] provided no reasonable avenue of complaint or [2]

knew of the harassment but did nothing about it." (internal citations and quotation marks

omitted)).  Thus, there is insufficient evidence for a reasonable factfinder to conclude that Mr.

Shoemaker engaged in conduct toward third-parties that "adversely affected the terms and

conditions of [Plaintiff's] own employment."  *Leibovitz*, 252 F.3d at 189.  Accordingly, the

Court grants summary judgment for Defendant on this claim.

### 3. Title VII Retaliation Claims

Plaintiff alleges that Defendant further violated Title VII by disciplining and terminating

her in retaliation for voicing complaints about racial and gender discrimination in the workplace.

To prove a prima facie case of retaliation under Title VII, a plaintiff must demonstrate:  (1) that

she participated in a protected activity; (2) that her employer was aware of that activity; (3) that materially adverse action occurred; and (4) that there was a causal connection between the protected activity and the adverse employment action. *See Kaytor v. Electric Boat Corp.*, 609 F.3d 537, 552 (2d Cir. 2010); *Kessler v. Westchester Cnty. Dep't of Soc. Servs.*, 461 F.3d 199, 205-06 (2d Cir. 2006). Even if a plaintiff can state a prima facie case of retaliation, her claim is still subject to the *McDonnell Douglas* burden shifting framework. *See Sumner v. U.S. Postal Serv.*, 899 F.2d 203, 209 (2d Cir. 1990).

### a. Complaints Regarding Alleged Sexual Harassment

Plaintiff alleges that she was disciplined and ultimately terminated because she reported Mr. Shoemaker's and Mr. Chandler's alleged sexual harassment to management. Defendants do not dispute that Plaintiff's report of alleged sexual harassment was protected activity, that Defendant was aware of this activity, and that Plaintiff being disciplined and terminated were adverse employment actions. However, Defendant contests that Plaintiff can show causation when her protected activity occurred after the discipline had begun.

Proof of causation can be shown either: (1) "directly, through evidence of retaliatory animus directed against the plaintiff by the defendant," or (2) "indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct." *Gordon v. N.Y.C. Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000). But, "'where timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise.'" *Blanc v. Sagem Morpho, Inc.*, No. 07-CV-3085, 2009 WL 1813236, at *15 (E.D.N.Y. June 25, 2009) (quoting *Slattery*, 248 F.3d at 95).

Here, Plaintiff first complained of Mr. Shoemaker's alleged sexual harassment of other employees in July 2003 (Tr. 145), and did not complain about any alleged sexual harassment by Mr. Chandler until September 23, 2003, (Swedish Aff. ¶¶ 3-4).  Defendant has presented uncontested evidence that Mr. Chandler discussed his concerns about Plaintiff's performance "a number of times throughout her employment" (Chandler Aff. ¶ 11), and issued Plaintiff a warning letter regarding her problems managing employees and completing assignments in June 2003, before Plaintiff ever complained of sexual harassment by either Mr. Shoemaker or Mr. Chandler, (*id.*; *id.* Ex. G).  Furthermore, the undisputed evidence shows that Mr. Chandler and Ms. Swedish had decided to issue the final warning letter to Plaintiff *before* she complained of any sexual harassment by Mr. Chandler.  (*Id.* ¶ 13; *id.* Ex. H (showing that Mr. Chandler contacted Ms. Swedish on September 4, 2003 requesting edits on the draft final warning letter, and that Ms. Swedish responded on September 8, 2003 with suggested edits and advice on how to discuss the final warning letter with Plaintiff).)  As a result, Plaintiff has failed to show causation when the record shows that the disciplinary action began prior to her protected activity.  *See Vaughn v. City of New York*, No. 06-CV-6547, 2010 WL 2076926, at *15 (E.D.N.Y. May 24, 2010) (granting summary judgment when, despite a gap of only a few months between the protected activity and the alleged adverse action, the plaintiff failed to show causation because she was subject to reprimands and discipline before she engaged in any protected activity); *Blanc*, 2009 WL 1813236, at *15 (granting summary judgment and dismissing retaliation claim when the plaintiff was warned about his "performance deficiencies . . . five months before [he] engaged in any protected activity").

Moreover, even if Plaintiff can establish a prima facie case, Defendant has proffered a legitimate, non-discriminatory reason for the warning letters and termination by providing

34

evidence that Plaintiff was challenging the decisions of her supervisor, not completing her work assignments, and having difficulties communicating and working with co-workers and other supervisors.  (Chandler Aff. ¶¶ 7-10; *id.* Exs. B-F; Lutz Aff. ¶¶ 3-4); *see Harrison v. N. Shore Univ. Hosp.*, No. 04-CV-2033, 2008 WL 656674, at *9 (E.D.N.Y. Mar. 6, 2008) (noting that insubordination and an "inability to get along with supervisors and co-workers" are legitimate, non-discriminatory reasons for termination); *Lee v. Healthfirst, Inc.*, No. 04-CV-8787, 2007 WL 634445, at *24 (S.D.N.Y. Mar. 1, 2007) (finding that the "[p]laintiff's insubordination and failure to fulfill her job responsibilities . . . [we]re legitimate justifications for the withholding of her bonus and her discharge").  As a result, Plaintiff bears the burden of establishing pretext, which she has failed to do.  First, Plaintiff admits that she disagreed with her supervisor about what areas and which employees were under her supervision (Tr. 75-80), and that she often challenged decisions made by Mr. Chandler or others, (*id.* at 197-99, 283-84; Lutz Aff. ¶ 5).  Second, Plaintiff's deposition, and her own affidavit, make clear that Plaintiff was highly critical of her co-workers and other managers.  (Tr. 94-96, 99, 203, 206-07; Pl.'s Stmt. ¶¶ 22, 43-46, 52-53, 67.)  Moreover, after she received the first warning letter, Plaintiff did not attend the classes that the letter instructed her to attend (Tr. 183), and she continued to fight with other managers and co-workers, (Chandler Aff. ¶ 12).  Tellingly, Mr. Chandler posted Plaintiff's job position on the internal website in early September (*id.* ¶ 13), and Plaintiff admits that she saw the vacancy posting in September "about the time" when she complained about Mr. Chandler to management, (Tr. 255-57).  As a result, summary judgment is warranted because Plaintiff has offered no evidence of pretext to rebut Defendant's legitimate reasons for the discipline and termination, especially considering that the time-line suggests that Plaintiff used the harassment complaints as a weapon after learning that her employment was potentially being terminated.

*See Ford v. Consol. Edison Co. of N.Y.*, No. 03-CV-9587, 2006 WL 538116, at *12 (S.D.N.Y.

Mar. 3, 2006) (granting summary judgment when the plaintiff's "conclusory allegations of

pretext . . . [we]re completely undermined by the largely undisputed evidence that [the p]laintiff

[failed to perform his job and was insubordinate]"); *see also Lee*, 2007 WL 634445, at *24

("Where an employee has been warned that her job performance is unsatisfactory and she

continues the same conduct, she cannot shield herself from legitimate managerial prerogatives

by threatening a discrimination complaint and then alleging unlawful retaliation.").

### b. Complaints About Alleged Racial Discrimination

Plaintiff also alleges that she was retaliated against for "living the anti-discrimination

laws" and reporting racial discrimination in March 2003, before the first warning letter was

issued. (Pl.'s Stmt. ¶¶ 162, 172.)  As an initial matter, the Court notes that many of Plaintiff's

allegations of "retaliation" involve complaints she made about non-actionable "mismanagement"

issues. (*Id.* ¶ 226.)  In other words, Plaintiff appears to allege that she was retaliated against for

reporting the mismanagement of others or for reporting incidents that she believed presented

sanitation problems. (*Id.* ¶¶ 198-99, 227, 240-45, 322, 324-25.)  Similarly, Plaintiff alleges that

she opposed the suspension of two African American employees for absenteeism because she

believed it was unfair to suspend employees who had been sick or attending a funeral when

absent, without alleging or providing evidence that she reported any racial discrimination related

to the suspensions. (*Id.* ¶¶ 174-75; Tr. 197-98.)  Because Title VII does not protect employees

from retaliation for opposing misbehavior of co-workers or supervisors that is unrelated to

discrimination on account of one of the protected classes, these claims lack merit. *See Santucci

v. Veneman*, No. 01-CV-6644, 2002 WL 31255115, at *4 (S.D.N.Y. Oct. 8, 2002) (granting

motion to dismiss because the "[p]laintiff's retaliation claims d[id] not involve some sort of

complaint about a type of discrimination that Title VII forbids;" instead the plaintiff "objected to the assignment/rotation system because of its relationship to an allegedly corrupt system of payoffs – *not* because defendant discriminated on the basis of race, color, religion, sex or national origin" (internal citation and quotation marks omitted)); *Manatu v. Bowery Residents Comm.*, No. 99-CV-722, 2000 WL 1159330, at *2 (E.D.N.Y. Aug. 11, 2000) (finding that the plaintiff failed to show that she engaged in protected activity when she "allege[d] that she was retaliated against [for] [] report[ing] mismanagement . . . to state auditors" because "Title VII does not protect whistleblowers who complain about mismanagement"); *Harper v. Hunter Coll.*, No. 95-CV-10388, 1999 WL 147698, at *1, *3 (S.D.N.Y. Mar. 15, 1999) (dismissing retaliation claim based on the plaintiff's reporting "unsafe conditions" because "'whistleblowing' activity of this nature is not protected under Title VII").  Additionally, Plaintiff proffers several incidents that she claims involved racial discrimination, such as Ms. Hanslmaier allegedly changing the work schedules of African American employees or once throwing coffee at an African American employee (Pl.'s Stmt. ¶¶ 177, 191-96), and an African American employee not receiving a promotion, (*id.* ¶ 178).  Plaintiff has failed to establish that she engaged in any protected activity related to these incidents as she does not allege, let alone provide evidence suggesting, that she reported these incidents to management or stated that they involved racial discrimination.  That, in hindsight, she might have believed these incidents to have involved discrimination does not create a factual dispute about whether her conduct was protected by the law.

Plaintiff also alleges that, sometime in 2003, she told Mr. Chandler that, based on what she had been told by others, Ms. Hanslmaier did not "like black people" and reported an incident involving Ms. McDonald, when Ms. Hanslmaier allegedly did not check on Ms. McDonald after water was splashed in her face and told her she could be fired for leaving the kitchen.  (Tr. 410-

11; Pl.'s Stmt. ¶¶ 166, 181-85.)  Plaintiff further alleges that in March 2003, she told Mr.

Chandler about hearing from another supervisor that an employee had reported hearing a kitchen

worker use a racial slur against another kitchen worker.  (Tr. 383-86.)[11]

Even construing all the facts in Plaintiff's favor, Plaintiff has failed to show that she

engaged in protected activity within the meaning of Title VII.  "[I]n order to establish that [she]

engaged in protected activity, 'a plaintiff need not prove that the conditions against which [she]

protested actually amounted to a violation of Title VII.'"  *Dottolo v. Byrne Dairy, Inc.*, 08-CV-

390, 2010 WL 2560551, at *6 (N.D.N.Y. June 22, 2010) (quoting *Wimmer v. Suffolk Cnty.*

*Police Dep't*, 176 F.3d 125, 134 (2d Cir. 1999)).  "Rather, [a plaintiff] must demonstrate only

that [s]he had a good faith, reasonable belief that the underlying challenged actions of the

employer violated the law."  *Wimmer*, 176 F.3d at 134 (internal quotation marks omitted); *see*

*also Martin v. State Univ. of N.Y.*, 06-CV-2049, 2010 WL 1257782, at *17 (E.D.N.Y. Mar. 26,

2010) ("Whether [the plaintiff's] belief [that the defendant's actions were unlawful] was

'objectively reasonable,' and not merely subjective, is determined based on the facts and the

record presented."); *Blanc*, 2009 WL 1813236, at *14 ("[A] plaintiff may prevail on a claim for

retaliation even when the underlying conduct complained of was not in fact unlawful so long as

---

[11] Although Plaintiff stated in her deposition that she wrote a note to Mr. Chandler saying that another racial incident had occurred in the kitchen, Plaintiff could not recall if she was referring to the incident about the kitchen workers or a different incident.  (Tr. 390.)  Similarly, Plaintiff alleges that she was retaliated against for "voicing" an opinion that an African American worker should not have been terminated because she reacted to the kitchen worker's racial comment (Pl.'s Stmt. ¶ 167), but Plaintiff did not provide any evidence suggesting that she discussed the employee's termination with Mr. Chandler or other management officials. Because Plaintiff has presented no evidence to suggest that she presented any other complaints of discrimination to Mr. Chandler in March 2003, Plaintiff's vague and conclusory assertion that she reported other incidents cannot defeat summary judgment.  *See Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991) (stating that "bald assertion[s], completely unsupported by evidence" cannot defeat summary judgment).

[she] . . . can establish that [she] possessed a good faith, reasonable belief that the underlying challenged actions of the employer violated the law." (internal quotation marks and brackets omitted)).  "Whether a plaintiff's belief is reasonable must be 'assessed in light of the totality of the circumstances.'" *Id.* at *14 (quoting *Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 292 (2d Cir. 1998)).  However, "an employee's complaint to an employer about unfair treatment in general is insufficient to constitute protected activity."  *Id.*, 2009 WL 1813236, at *13.  Thus, even if an employee believes that another employee is a victim of discrimination, "an undisclosed belief of such treatment will not convert an ordinary employment complaint into a protected activity."  *Aspilaire v. Wyeth Pharm., Inc.*, 612 F. Supp. 2d 289, 309 (S.D.N.Y. 2009).

Plaintiff's vague report to Mr. Chandler about Ms. Hanslmaier not liking black people and the incident involving Ms. McDonald does not show a reasonable belief that Ms. Hanslmaier engaged in discriminatory conduct.  First, although Plaintiff alleges that she reported the Ms. McDonald incident, she presented no evidence explaining what she reported to Mr. Chandler or even that this report occurred prior to the warning letters.  *See Sales v. YM & YWHA of Wash. Heights & Inwood*, Nos. 00-CV-8641, 01-CV-1796, 2003 WL 164276, at *8 (S.D.N.Y. Jan. 22, 2003) (finding that the plaintiff's ambiguous complaint to his supervisor about a "racially derogatory" term was not protected activity when the plaintiff did not explain the ambiguous term).  Second, although Plaintiff appears to subjectively believe that Ms. Hanslmaier's actions constituted racial discrimination, she has presented no evidence suggesting that this belief was reasonable.  For example, Plaintiff makes conclusory claims of racism, but admits that Ms. Hanslmaier did not make any racial comments during the incident with Ms. McDonald.  (Tr. 411.)  Furthermore, Plaintiff has not alleged that Ms. Hanslmaier treated any employees outside the protected class differently than she treated Ms. McDonald.  *See Moore v. Transitional Servs.*

39

*of N.Y.*, 96-CV-1193, 1998 WL 71824, at *5 (E.D.N.Y. Feb. 2, 1998) (granting summary judgment on retaliation claim when the plaintiff had not presented sufficient evidence that she engaged in protected activity because she did not show that the conflict between herself and her co-worker was motivated by gender).  Indeed, Plaintiff admits that her subjective belief regarding Ms. Hanslmaier's motivations is based on what others told her.  (Tr. 410.)  Such vague and conclusory allegations of racial discrimination do not support a finding that Plaintiff's belief that Title VII was violated was reasonable.  *See Panzarino v. Deloitte & Touche LLP*, No. 05-CV-8502, 2009 WL 3539685, at *11 (S.D.N.Y. Oct. 29, 2009) (finding that the plaintiff's reporting, among a host of issues, that a supervisor told another employee to work on an assignment because the prospective client was African American, was not protected activity when the plaintiff did not report that "she thought the practice was discriminatory"); *see also Blanc*, 2009 WL 1813236, at *13 (noting that "[c]areless and uncounseled accusations of discrimination . . . are not necessarily protected" by Title VII (internal quotation marks omitted)); *Soliman v. Deutsche Bank AG*, 03-CV-104, 2004 WL 1124689, at *13 (S.D.N.Y. May 20, 2004) ("[W]here a plaintiff's complaint is vague or ambiguous and does not sufficiently articulate the nature of harassment, courts hold that a plaintiff has not engaged in a protected activity.").

Plaintiff's allegation that, in March 2003, she reported the incident involving the kitchen worker's use of a racial slur is somewhat less vague; however, Plaintiff has not shown that her belief that Title VII was violated was objectively reasonable when she reported an isolated comment involving people who were not employees of Defendant, that was reported to her by another supervisor, who had told Plaintiff what she had heard from another employee.  *See Abeln v. Ultra Life Batteries*, No. 07-CV-6113, 2009 WL 857497, at *3 (W.D.N.Y. Mar. 30, 2009)

(finding that the "plaintiff [did] not have [] a reasonable belief that his complaint concerning [an] isolated, 'offensive utterance' constituted sexual harassment," when the comment "was not specifically directed toward [him]" and he did not allege that any other comments occurred); *see also Dottolo*, 2010 WL 2560551, at *7 (finding that allegation of reporting one sexual comment did not show that the plaintiff's belief that Title VII was violated was objectively reasonable); *Middleton v. Metro. Coll. of N.Y.*, 545 F. Supp. 2d 369, 375 (S.D.N.Y. 2008) (finding that the plaintiff's reporting of the isolated use of a sexual profanity was not protected activity when the comment was uttered by a co-worker, during a fight, in front of the plaintiff's supervisor, and when the conduct was not repeated); *Holmes v. Long Island R.R.*, No. 96-CV-6196, 2001 WL 797951, at *6 (E.D.N.Y. June 4, 2001) (granting summary judgment on retaliation claim because "[g]iven the isolated nature of the incidents complained of . . . [the] plaintiff could not have had an objectively reasonable belief that Title VII had been violated").  Put another way, Plaintiff has not shown that her third-hand reporting of this one-time comment by another employer's employees put Defendant on notice of potential discrimination, especially when another supervisor (who reported the comment to Plaintiff) had already expressed disapproval regarding the incident.  *See Galdieri-Ambrosini*, 136 F.3d at 292 ("[I]mplicit in the requirement that the employer have been aware of the protected activity is the requirement that it understood, or could reasonably have understood, that plaintiff's opposition was directed at conduct prohibited by Title VII.").

Furthermore, even assuming that Plaintiff has sufficiently shown that she engaged in protected activity, Plaintiff cannot show causation based solely on temporal proximity when almost four months passed between her reporting of allegedly discriminatory incidents in March 2003 and Mr. Chandler's first warning letter on June 27, 2003.  *See Barney v. Consol. Edison*

*Co. of N.Y.*, No. 99-CV-823, 2009 WL 6551494, at \*12 (E.D.N.Y. Oct. 1, 2009) ("[D]istrict

courts within the Second Circuit have consistently held that the passage of two to three months

between the protected activity and the adverse employment action does not allow for an

inference of causation." (internal quotation marks omitted)); *see also Ruhling v. Tribune Co.*,

No. 04-CV-2430, 2007 WL 28283, at \*23 (E.D.N.Y. Jan. 3, 2007) (noting that "a passage of two

months between the protected activity and the adverse employment action seems to be the

dividing line"); *Nicastro v. Runyon*, 60 F. Supp. 2d 181, 185 (S.D.N.Y. 1999) ("Claims of

retaliation are routinely dismissed when as few as three months elapse between the protected

EEO activity and the alleged act of retaliation."). In any event, even assuming that Plaintiff has

satisfied her prima facie case, Defendant has, as already discussed, proffered a legitimate reason

for the warning letters and termination. Plaintiff's extremely weak evidence of causation is

insufficient to show pretext, especially when she admits that Mr. Chandler did not discipline her

after she reported the incidents to him in March 2003. (Tr. 391); *see Ford*, 2006 WL 538116, at

\*11 (noting that "[a]t the pretext stage, the factual inquiry proceeds to a new level of specificity"

(internal quotation marks omitted)); *Mathurin v. Skrivaneck*, No. 00-CV-1762, 2003 WL

23744279, at \*13 (S.D.N.Y. June 10, 2003) ("Upon the proffer of [] a neutral reason, the burden

returns to the plaintiff to prove that retaliation was a motivating factor in the employer's

decision."). Considering the third-hand reporting of Plaintiff's complaint to Mr. Chandler and

the undisputed evidence that Plaintiff was insubordinate and struggled as a manager, no

reasonable juror could find that Defendant disciplined and terminated Plaintiff in retaliation for

her complaints in March 2003.[12]   *See Bynog v. SL Green Realty Corp.*, No. 05-CV-305, 2007

---

[12] To the extent Plaintiff alleges that she was retaliated against for reporting racial
discrimination to Ms. Swedish in her September 25, 2003 letter, Plaintiff has failed to show

WL 831740, at *9 (S.D.N.Y. Mar. 20, 2007) (granting summary judgment on retaliation claim when the defendants "advanced a legitimate non-discriminatory reason for [the plaintiff's] termination, and [the plaintiff] [could not] refute it as pretextual"); *Mathurin*, 2003 WL 23744279, at *13 (dismissing retaliation claim when the "defendant invok[ed] the perceived inadequacy of plaintiff's performance as a neutral reason for her supervisors' actions, and [she] fail[ed] to offer any evidence that this explanation [wa]s untrue").

### D. State Law Whistleblower Claims

Construed liberally, Plaintiff's Amended Complaint also arguably raises state law claims under New York Labor Law Section 741, which prohibits employers that "provide[] health care services" from retaliating against employees who "perform[] health care services" if those employees have "disclose[d] or threaten[] to disclose to a supervisor, or to a public body an activity, policy or practice of the employer or agent that the employee, in good faith, reasonably believes constitutes improper quality of patient care." N.Y. Lab. Law § 741; *see also* N.Y. Lab. Law § 740(4) (authorizing civil action for retaliatory personnel action). However, having dismissed all of Plaintiff's federal claims, the Court must determine whether to exercise supplemental jurisdiction over these state law claims.

"The district courts may decline to exercise supplemental jurisdiction over a claim . . . if . . . the district court has dismissed all claims over which it has original jurisdiction . . . ." 28 U.S.C. § 1367(c)(3). "Once a district court's discretion is triggered under § 1367(c)(3), it balances the traditional values of judicial economy, convenience, fairness, and comity, in deciding whether to exercise jurisdiction." *Kolari v. N.Y.-Presbyterian Hosp.*, 455 F.3d 118, 122

---

causation when, as already explained in relation to her sexual harassment complaints, Plaintiff was disciplined before she engaged in this protected activity.

(2d Cir. 2006) (internal citations and quotation marks omitted). "[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered . . . will point toward declining to exercise jurisdiction over the remaining state-law claims." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988).

The Court finds that nothing distinguishes the instant case from "the usual case." Plaintiff's federal claims are all dismissed prior to trial, and there is no reason to believe that judicial economy, convenience, or fairness would be served by this Court exercising supplemental jurisdiction over Plaintiff's state law claims, and to do so would be inconsistent with the principle of comity. Thus, Plaintiff's putative state law whistleblower claims are dismissed without prejudice to refiling in state court.

### III. Conclusion

For the reasons discussed above, Defendant's Motion for Summary Judgment is granted. The Clerk of Court is respectfully directed to terminate the pending motion (Dkt. No. 35), grant judgment for Defendant, and to close this case.

SO ORDERED.

Dated:        September 29, 2010
              White Plains, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE

Service List

For Mailing By the Clerk's Office:

Deborah Kamrowski
P.O. Box 689
Florida, NY 10921

Andrew Paul Marks, Esq.
Littler Mendelson, P.C. (NYC)
900 Third Avenue
New York, NY 10022